STATE of Minnesota, Respondent,

v.

Norma RUUD, et al., Appellants,

Royce Ruud, et al., Appellants.

No. 47030.

Supreme Court of Minnesota.

Oct. 21, 1977.

Rehearing Denied Dec. 2, 1977.

Broeker, Hedges & Grant, John M. Broeker, and Eleni P. Skevas, Minneapolis, for Norma Ruud et al.

Hulstrand, Anderson & Larson and George E. Hulstrand, Willmar, for Royce Ruud et al.

Warren Spannaus, Atty. Gen., Thomas L. Fabel, Deputy Atty. Gen., Barbara D. Gill, Sp. Asst. Atty. Gen., Dept. of Public Welfare, St. Paul, and Ronald H. Schneider, County Atty., Willmar, for respondent.

PETERSON, Justice.

Defendants, Norma Ruud, her husband Royce Ruud, and Willmar Nursing Home, Inc., appeal from conviction by a jury for theft, Minn.St. 609.52, subd. 2(3); 609.05, and presenting false claims to a public body, Minn.St. 609.465; 609.05. Norma and Royce were each fined $7,500 and placed on probation. The nursing home was fined $10,000. We affirm.

Defendants Norma and Royce Ruud own and operate defendant Willmar Nursing Home. Royce Ruud is president of the nursing home; Norma is secretary-treasur-

er and administrator. The cost of nursing home care for eligible welfare recipients is subsidized by the Medical Assistance Program which is governed by Title XIX of the Federal Social Security Act and Minn.St. c. 256B, and administered in Minnesota by the Department of Public Welfare (DPW). DPW reimburses nursing homes, such as defendants', for each eligible patient at a "welfare per diem rate," calculated by dividing "reasonable" costs of patient care by "adjusted patient days."[1] Actually, the rate is determined by a complex formula embodied in Minn.Reg. DPW 49 (hereafter Rule 49), which was promulgated in 1972. A Rule 49 cost report must be submitted to the DPW by each participating nursing home each fiscal year. This multipage report lists various patient-day statistics but is devoted primarily to the itemization of patient-care costs categorized in Rule 49 as nursing, dietary, laundry and linen, housekeeping, plant operation and maintenance, or administration expenses. The cost accounting required by the Rule 49 report is an exhaustive one, covering everything from daily operating costs, such as salaries, to depreciation on capital assets.

DPW has issued regulations governing what costs may be considered patient-care related and thus may be included in determining the reimbursement rate. Minn.Reg. DPW 49, IV. A. 1 (§ 4931a) provides:[2]

"*Reasonable costs.* Costs to be allowable for rate setting purposes must satisfy the following over-all criteria:

a. They must be necessary and ordinary costs related to patient care.

b. They must be costs that prudent and cost-conscious management would pay for a given item or service."

The regulations explicitly disallow as allowable costs the "[p]ersonal expenses of owners or employees, such as homes, boats, air-

planes, vacation expenses, etc." Minn.Reg. DPW 49, IV. C. 4 (§ 4933d). As a general rule, the higher the reported costs, the higher the reimbursement rate. The regulations do provide an incentive for rate-cutting, however, by imposing a ceiling on some allowable costs and establishing a maximum state-wide rate.

On December 30, 1974, Willmar Nursing Home submitted a Rule 49 cost report for its fiscal year 1973–74 which ended July 31, 1974. The report was signed by Norma Ruud and prepared by accountant Oiva Penttila. Beginning in February 1975, DPW made monthly payments to the nursing home based upon the new reimbursement rate calculated in that report. Although the new rate became effective in February, it remained subject to adjustment for errors or omissions which might be determined through a subsequent audit. All reports are subject to desk audit by DPW and may, additionally, be subject to field audit, i. e., examination of supporting records. Adjustments are generally limited to 3 complete fiscal years preceding the date a field audit commences.

On December 10, 1974, 3 weeks before Willmar Nursing Home submitted its 1973–74 Rule 49 cost report, DPW auditor Raymond Otto was assigned to do a field audit of Willmar Nursing Home's records for fiscal year 1972–73. Otto worked several weeks with the home's poorly organized recordkeeping system and identified what he felt were numerous questionable items, primarily items that appeared to be personal expenses, paid by nursing home checks and included in the Rule 49 report. After Otto had been at the nursing home about 15 working days, considerably longer than the average time spent on an audit, Norma Ruud asked him to leave. Otto reported his findings to Robert Rau, audit director of

1. In fiscal year 1974–75, DPW reimbursed Willmar Nursing Home in the amount of $280,-351.65, a substantial portion of the home's budget. During that same period DPW reimbursed nursing homes throughout the state a total of approximately $150 million for nursing home care rendered to some 23,000 welfare recipients who comprise about 60 to 65 percent

of the total number of nursing home residents. Approximately 70 percent of Willmar Nursing Home residents are welfare recipients.

2. We have adopted the form of including the unofficial rule citation in parentheses after the official citation.

the DPW audit division. On February 3, 1975, Rau submitted certain questions to Norma Ruud about some of the questioned expenditures. Upon the suggestion of accountant Penttila, Rau asked that Norma respond by affidavit. Copies of the questions were sent to Norma's attorney and to Penttila. Norma's attorney responded pledging her willingness to answer any further questions.

· Upon receipt and examination of Norma's answers to the submitted interrogatories, Rau and Otto believed a number of the responses were false and inconsistent with the underlying documentation, mainly charge slips and invoices, which Otto had examined during his field audit. Rau submitted the matter to the attorney general's office, and several weeks later a deputy attorney general secured warrants to search the record storage areas of both the nursing home and the Ruud residence located across the street. The search commenced at approximately 6:30 p. m., August 28, 1975.

Evidence obtained in the search was submitted to the grand jury. Based upon the 1973–74 Rule 49 cost report, the grand jury indicted Norma Ruud, Royce Ruud, and Willmar Nursing Home, Inc., for presenting false demand for audit to a public body. For the excess reimbursement paid by DPW in reliance upon the false report to the nursing home between March 1, 1975, and August 31, 1975, the grand jury indicted them for theft of more than $2,500.

According to the state's evidence, defendants' 1973–74 Rule 49 report included a total of $40,049.36 in expenses improperly claimed as patient-care costs. This resulted in overpayment of $15,723.68 between March 1, 1975, and August 31, 1975. The expenses challenged by the state included $24,050 in salaries paid by the nursing home during the 1973–74 fiscal year to the four Ruud children. The payroll ledger reflected that the children worked 80 hours biweekly, although, unlike other payroll employees, they kept no time cards and worked no regular shifts for these salaries.[3] One daughter receiving a salary for full-time nursing home employment was a full-time student at Macalester College in St. Paul during the year at issue. Of the two sons, one was in the United States Air Force and stationed in Rapid City, South Dakota. The other owned and operated a farm outside Willmar. Additional expenses challenged by the state included $1,582.24 recorded as "laundry and linens" on the nursing home books and paid to a Minneapolis department store for clothing and personal items purchased by the two Ruud daughters for their own use; over $2,000 paid in salaries to two housekeepers, one at the Ruud residence and one at a lake cabin; a $50.86 high school class ring for one daughter and a $275 accuquartz watch for Royce Ruud, both recorded on the nursing home books as "general and administration" costs. Defendants did not deny that some expenses were improperly included on the Rule 49 report, but they attributed this to "sloppy" bookkeeping, not an intent to steal.

The issues raised by defendants on their consolidated appeals are:

1. Was there probable cause for the issuance of a search warrant, and did the warrant state with sufficient particularity the things to be seized?

2. Was Robert Rau properly allowed to testify as an expert on personal expenses and to submit into evidence a chart listing the alleged personal expenses?

3. Did the trial court err in its evidentiary rulings admitting Spreigl evidence without cautionary instructions; admitting the affidavit of Norma Ruud; admitting payroll checks signed by Royce Ruud and properly included as Rule 49 costs; and excluding defendants' evidence of prior law-abiding acts?

4. Did the trial court err by refusing to instruct the jury on those parts of Rule 49

---

**3.** One daughter, a high school student, received a second payroll check for a part-time job as a hostess at the nursing home. For the hours worked at this job, as many as 27 during the 2-week pay period, she punched a timeclock. The state did not challenge the salary paid her for these hours and included in the Rule 49 report.

which were applicable to defendants' theories of defense?

5. Were defendants denied their right to a fair and impartial jury by the method of jury selection?

6. Does the evidence support the conviction of Royce Ruud?

1. Defendants argue that evidence seized during the course of the search is inadmissible because the affidavits in support of the warrants fail to state reliable facts upon which a finding of probable cause may be based and because the warrant failed to particularly describe the items to be seized. Defendants' arguments are without merit.

■ The leading case on the probable cause requirement is *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). Its two-pronged test for determining whether an affidavit based upon hearsay information may support a search warrant has been applied frequently by this court. The affidavit must contain sufficient underlying facts so that the magistrate may draw his own conclusions as to whether probable cause exists to believe that a crime has been committed and as to whether the affiant's source of those facts is credible or his information reliable.

■ In the present case, Robert Rau, DPW audit director of the audit division, prepared the affidavits. Each affidavit states that, pursuant to statutory authority, Rau and DPW auditor Otto commenced an audit of the cost data required by Rule 49 and submitted by Willmar Nursing Home for the fiscal years ending July 31, 1972, and July 31, 1973. Based upon Otto's preliminary investigation of numerous business records of the Willmar Nursing Home and interviews with an unnamed former nursing home employee and a former employee who worked in the home of Norma and Royce Ruud, Rau concluded that the costs reported included goods and services purchased for the personal benefit of the Ruud family; e. g., groceries, a rifle and shells, and repairs on the Ruud residence and farm. The affidavit states sufficient underlying facts to support the magistrate's conclusion that probable cause exists to believe a crime had been committed. Furthermore, the source of the facts is reliable. Otto is a named informant and is employed by the state precisely for the purpose of performing audits. "Unlike an informant whose information may come from his own criminal background or even complicity in the particular event reported, * * * [he] may be presumed reliable." *State v. Cox*, 294 Minn. 252, 254, note 1, 200 N.W.2d 305, 307 (1972); accord, *State v. Mazzadra*, 28 Conn.Sup. 252, 258 A.2d 310 (1969). There is no reason to suspect Otto's motives. See, *State v. Mollberg*, Minn., 246 N.W.2d 463 (1976). On the contrary, his professional reputation depends upon the accuracy of his observations. Finally, Otto obtained his information in a reliable manner from firsthand observation while in the course of his employment.

Whether or not the former employees of the nursing home or the Ruud residence whom Otto interviewed can be considered reliable sources presents a more difficult question. They desired not to be named, and as former employees they might have a motive to lie or exaggerate. See, *State v. Lindquist*, 295 Minn. 398, 205 N.W.2d 333 (1973); *State v. Cvar*, 293 Minn. 439, 196 N.W.2d 624 (1972). Their reliability is not critical, however, because the affidavit states probable cause without their additional information.

■ Defendants argue that the search warrants authorized a general, exploratory search in contravention of the Fourth Amendment requirement that a warrant "particularly" described the place to be searched and the things to be seized. See, *State v. Streitz*, Minn., 258 N.W.2d 768 (filed September 23, 1977); *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). The search warrants, one for the offices and record storage places at the residence and one for the offices and record storage places at the nursing home, each directed seizure of the following property:

(1) All records and documents evidencing purchases of goods and services made by any past or present agent, employee, or owner of Willmar Nursing Home, Inc., 500 Russell Street, Willmar, Minnesota, since August 1, 1971, to the present.

(2) All records and documents evidencing the identity of the person(s) responsible for making purchases of goods and services for Willmar Nursing Home since August 1, 1971, to the present.

(3) All records and documents indicating the identity of any person(s) who made a purchase of goods or services in the name or on the account of Willmar Nursing Home since August 1, 1971, to the present.

(4) All records and documents indicating the identity of the person(s) who received goods or services purchased in the name or on the account of Willmar Nursing Home since August 1, 1971, to the present.

(5) All records and documents of cash or credit receipts and disbursements received or made by Willmar Nursing Home, its agents, employees, or owners since August 1, 1971, to the present, including but not limited to canceled checks.

(6) All bookkeeping and accounting records of Willmar Nursing Home which relate to the information required or provided upon each Rule 49 report or attachments submitted to the Minnesota Department of Public Welfare or Kandiyohi County Welfare Department by Willmar Nursing Home since August 1, 1971, to the present.

(7) All records of inventory and cost analysis prepared or generated in relation to the determination of expenses incident to patient care at Willmar Nursing Home since August 1, 1971, to the present.

(8) All records, correspondence, and other documents indicating who had knowledge of person(s) purchasing and/or receiving goods and services obtained in the name or on the account of Willmar Nursing Home since August 1, 1971, to the present.

(9) All records, correspondence, memoranda, and other writings or things indicating who wrongfully received goods, services, or funds from Willmar Nursing Home since August 1, 1971, to the present.

(10) All records, agreements, or other writings which identify the person(s) who have conspired together to obtain funds from a public body through fraud, deception, misrepresentation, or theft since August 1971, to the present.

(11) All records, agreements, or other writings which identify the person(s) who have a direct interest in the assets and liabilities of Willmar Nursing Home.

(12) All audits, bookkeeping reports, and ledgers showing any debits or credits of Willmar Nursing Home.

(13) All bookkeeping, accounting, tax, payroll, and other records and documents identifying recipients and amounts of wages paid by Royce or Norma Ruud, or any partnership or corporation controlled by the same, for services performed for the benefit of any properties owned or managed by said persons other than the Willmar Nursing Home.[4]

Defendants contend that the warrants were "vague to the nth degree," even though the state knew exactly what documents it wanted, and that the warrants listed "every conceivable business and cost-related accounting record in a nursing home."

■ A warrant can only be as specific as the nature of the materials sought will allow. See, *James v. United States*, 416 F.2d 467 (5 Cir. 1969). The costs which must be disclosed in a Rule 49 report involve virtually all of a nursing home's financial records from the reporting year or years at issue. In arguing that the state knew exactly what documentation it needed, defendants refer to a list of 50 payees and another list

---

4. Subsequent to the search, defendants commenced a civil suit to enjoin the state from presenting the seized records to the grand jury and to mandate their return. The court ordered the return of items seized under paragraph 13 of the warrant and reserved the issue of the legality of the search for determination at the omnibus hearing. At the omnibus hearing, the court upheld the search as being "valid and legal in all respects."

of 44 vendors [5] titled "Unresolved Expenditures Indicating Rule 49 violations" which Otto had drawn up on the basis of his investigation of the nursing home's records. Defendants do not suggest how a warrant might be drafted to cover the books and records in which these items are listed as well as the underlying documentation showing the purchases represented thereby, their source and destination. Even if such a warrant could be drafted, the time and expertise necessary to execute it would impose an unreasonable burden. See, *United States v. Scharfman*, 448 F.2d 1352 (2 Cir. 1971). Furthermore, this list is not exhaustive of the materials which the state legitimately sought, e. g., documents which disclose the identity of persons authorizing or making such expenditures.

The case of *VonderAhe v. Howland*, 508 F.2d 364 (9 Cir. 1974), upon which defendants place great reliance, is inapposite. There, an IRS audit of a dentist's account books showed his income tax returns for the 2 years in question to be accurate. The IRS subsequently learned from a former employee that the dentist kept a second set of records. Upon the basis of this information, the IRS requested and was issued a search warrant which covered all of his financial records, including those previously examined and found proper. The court held that the warrant was too broad. Here, the nursing home records were not so easily separable. And even those records evidencing costs validly included in the Rule 49 cost report were properly within the reach of the warrant in so far as they provided evidence of such facts as who authorized purchases and who had knowledge of nursing home finances, both relevant to proof of intent. Defendants' argument that less intrusive means should be pursued before resort to a search warrant is without merit and not supported by the authority cited.

As for defendants' argument that the search itself was impermissibly general because it covered the entire house, there is no evidence that the person who looked in each room did more than verify that all "offices and record storage places" had been identified.

2. Robert Rau was the state's first witness at trial. As audit director of the audit division of DPW, he supervises 10 or 11 auditors and various other clerical employees. The audit division is charged with the responsibility of performing "desk audits" on cost reports from nursing homes and intermediate care facilities for the mentally retarded. As director, Rau reviews all Rule 49 rate determinations. The division also performs field audits of these nursing homes and care facilities.

Rau testified about the history of the promulgation of Rule 49; the purpose of the rate and the way in which it is figured; the reporting and verification procedures; the time at which the rate becomes effective; and the methods by which payment is made by DPW to the nursing home applicant. Rau identified the 1972–73 and 1973–74 Rule 49 reports submitted by defendant Willmar Nursing Home, which were then admitted into evidence.

Rau was asked to describe the field audit undertaken of Willmar Nursing Home, the expenditures which Otto identified as questionable, and the attempts to obtain explanation of these expenditures from Norma Ruud. The affidavit signed by Norma, which purported to answer various of Otto's questions, was introduced into evidence. Rau then stated his opinion as an auditor, based upon receipts and invoices and other such underlying documentation, as to what each of the questioned purchases in fact represented. For instance, by matching up invoices and nursing home checks, he opined that the department store bill, which Norma had identified in her affidavit as representing a purchase of linens and upholstery material for recovering chairs used at the nursing home, in fact represented payment for such things as a handbag, billfold, small appliances, a girdle, one sweater, and slacks. Rau testified that these bills were paid with nursing home checks and were

---

**5.** The term "vendors" is used to mean all persons, including employees, or businesses, who were paid by the nursing home for goods or services.

expenses included in the 1972–73 Rule 49 report.

Rau's testimony then turned to the Rule 49 report for the indictment year, 1973–74. The state introduced some 27 exhibits, each consisting of an envelope containing numerous invoices and sales and charge slips from a particular vendor. Rau was asked where the documents came from (most were seized in the search of the nursing home records and the others were obtained from vendors); what they represented (invoices, sales and charge slips, canceled checks, ledgers); what purchases were represented by them; whether they were included in the Rule 49 report; in what cost category they were reported; whether in his opinion they represented purchases of goods and services related to patient care; and what amount was improperly included on the report for each of the items which in his opinion was not related to patient care. Following testimony by Rau, the vendors testified. They identified their own charge slips and invoices, their endorsements on nursing home checks, and the products or services for which they were paid.

██ Defendants argue that Rau is not qualified to testify as an expert in rendering an opinion that reported costs were not patient-related because he is not a certified public accountant and has absolutely no training in patient care or medicine. With respect to Rau's opinions based upon a knowledge of auditing procedures or accounting principles, defendants' argument is specious. Rau has an undergraduate degree in business administration. Since graduating he has completed five courses in accounting, in addition to many years of work experience in the accounting and auditing field. As audit director, he supervises other state-employed auditors and reviews audits prepared by them. What is more, he helped to draft Rule 49.

As to Rau's medical or patient care qualifications, whether or not a particular expense for an item purchased for and used by the patients was a reasonable, treatment-related expense is not at issue in the case. The items which Rau disallowed were

items which in his opinion, based upon the nature of the item purchased, the person who charged it, and the place it was delivered, were purchased for the personal use of the defendants and their children. Therefore, the issue is whether or not goods and services purchased by the nursing home were actually used by the nursing home. Defendants did not contest the impropriety of many expenses included on the Rule 49 cost report; e. g., a rifle and shells purchased by one son. The majority of expenses which they did seek to justify, such as the cost of a desk built in the Ruud residence and used by Norma in the performance of nursing home paperwork, were not medical in nature.

Defendants argue that many of Rau's opinions were based upon commonsense and therefore invaded the province of the jury. Defendants failed to make this objection at trial and may not raise it now. Similarly, although defendants argue to the contrary, the record does not clearly reveal an objection on the grounds of hearsay.

Defendants raise one argument, relative to the admission of state's exhibit 48, which merits some discussion. Exhibit 48 is a large chart, approximately 6 feet square, which purports to summarize Rau's testimony of alleged personal expenses. The chart lists each vendor from whom defendants purchased goods or services which, according to the state, were improperly included on the Rule 49 cost report because unrelated to patient care. The chart lists the amounts paid to each vendor and indicates how the amounts were recorded on the nursing home's books. It shows the total amount of challenged expenses for which the nursing home sought reimbursement, $40,049.36, and the total resultant overpayment to the nursing home during the 6 months covered by the indictment, $15,723.68. The chart carries the title "SUMMARY OF WELFARE REIMBURSEMENT FOR PERSONAL EXPENDITURE."

The issue is whether admission of this exhibit, and particularly its inclusion among those exhibits which the jury took with it

during deliberation, was prejudicial. The problem was described by the United States Supreme Court in *Holland v. United States*, 348 U.S. 121, 127, 75 S.Ct. 127, 131, 99 L.Ed. 150, 160 (1954), a tax case, as follows:

" * * * There is a great danger that the jury may assume that once the Government has established the figures in its net worth computations, the crime of tax evasion automatically follows. The possibility of this increases where the jury, without guarding instructions, is allowed to take into the jury room the various charts summarizing the computations; bare figures have a way of acquiring an existence of their own, independent of the evidence which gave rise to them."

■■■ The admission of such charts is, of course, addressed to the discretion of the trial court. As a general rule, such charts are admitted in long, complicated cases where they accurately represent the proponent's testimony or theory and where the court determines that such would be an aid to the jury and instructs the jury to use the exhibit only as an aid and not as the evidence itself. Annotation, 16 A.L.R.Fed. 542.

■ Defendants did not request a limiting instruction, and the trial court did not give one. Neither did defendants object specifically to the title on the chart, although they now cite authority condemning the use of such headings. In the absence of a request for an instruction and an objection to the title, we hold that the admission of the exhibit was not reversible error in this case. The chart was helpful as an accurate summary of the extensive testimony of Rau and some 29 vendors. The jury also had as exhibits the primary evidence summarized by the chart, invoices, charge slips, and canceled checks which were contained in large manila envelopes, one envelope per vendor. These were easily accessible for the jury to peruse to see for itself the nature of the items charged to the nursing home.

■ 3. Defendants assign numerous errors in the trial court's evidentiary rulings. Upon a thorough review of the record, we find the argument that defendants were prejudiced by the introduction of substantial Spreigl evidence in the absence of proper procedural safeguards to be without merit. The state gave notice prior to the omnibus hearing of its intent to introduce evidence of other crimes as required by Rule 7.02, Rules of Criminal Procedure. We recently held that in the absence of an objection or request, the remaining Spreigl-Billstrom [6] procedures are not mandatory. *State v. Forsman*, Minn., 260 N.W.2d 160 (filed September 2, 1977). In the present case, at the time evidence was admitted, the trial court gave a cautionary instruction where requested and proper.[7] The court also included a cautionary instruction in its final charge to the jury.

■ Defendants' argument that the affidavit signed by Norma Ruud was a coerced confession and inadmissible is without merit. DPW audit director Rau sent a list of questions to Norma, requesting her to respond by affidavit. Contemporaneously, he sent copies of the list to Norma's attorney and to her accountant. A letter acknowledging receipt of the questions was sent to Rau by Norma's attorney several

---

6. *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965); *State v. Billstrom*, 276 Minn. 174, 149 N.W.2d 281 (1967).

7. The 1972–73 Rule 49 cost report and the affidavit signed by Norma Ruud were properly admitted without the requested cautionary instruction. The mere filing of a report is not a crime. Likewise with the affidavit, its admission was not tantamount to evidence of a prior crime in the absence of evidence that any of the statements made therein were false or concealed items improperly reported. Before any such evidence was introduced, the court gave a limiting instruction. Defendants now complain of the trial court's mistaken reference in that instruction to the 1974–75 cost report as the one for which defendants were indicted rather than the 1973–74 report. This sort of misstatement, which neither defense nor the state noticed or objected to at the time, could not be assigned as error on appeal if it had been given as part of the final charge. Rule 26.03, subd. 18, Rules of Criminal Procedure. The same principle should apply here.

days later. In preparing her answers, Norma consulted with her attorney as well as with her accountant. The answers were sent to Rau under cover letter from Norma's attorney. The record does not reveal that there were at any time threats of economic sanction nor that the civil audit was a pretext to obtain information to be used in a contemplated criminal prosecution, as defendants contend. Norma Ruud was not in custody nor was she being interrogated by police when she answered the questions asked by Rau. She had not been "deprived of [her] freedom in any significant way." *Beckwith v. United States*, 425 U.S. 341, 344, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1, 6 (1976). Hence, *Miranda* warnings were not necessary and the affidavit was properly admitted.

■ Royce Ruud argues that the admission of payroll checks signed by him was prejudicial and without probative value. These checks represented expenses properly included in the Rule 49 report. Since Royce Ruud did not sign the 1973–74 Rule 49 report, the state's case against him necessarily rested on the theory that he aided and abetted the filing of the false claim and the theft effected thereby. The state offered the checks to show Royce Ruud's involvement in financial affairs of the corporation, and they were probative in that respect. That the evidence was prejudicial in the sense that it implicated defendant in the crime charged against him is not a cognizable objection.

■ We find no error in the court's exclusion of evidence which defendants characterize as "exculpatory evidence of prior law abiding acts." [8] The trial court did allow substantial amounts of testimony. Much of what it excluded was merely cumulative. Other evidence, e. g., personal checks written in 1968, were properly excluded as too remote. One check written by Royce Ruud to the nursing home was excluded because he could not explain why the check was paid. Another example raised by defendants, e. g., that the Willmar Nursing Home's reimbursement rate was lowest of the five nursing homes in Kandiyohi County, was properly excluded as irrelevant.

■ 4. Defendants assign numerous errors with respect to the trial court's instructions, two of which merit discussion. Defendants argue that the court erred in refusing to give the following requested instruction:

> "Therefore, even if you find that the defendants herein have filed a false and fraudulent Rule 49 cost report herein based on the law in these instructions, you may not convict defendants of the crimes charged unless the filing of such reports has resulted in an overpayment. On determining whether or not an overpayment has been made you may take into consideration costs which defendants could have reported but did not report on their Rule 49 cost report."

Assuming this requested instruction fairly states the law, the trial court nevertheless did not err in refusing to so instruct because defendants introduced no evidence on which the jury could evaluate the value of the goods and services allegedly donated to the nursing home without reimbursement. Norma Ruud testified to a number of items given by her to the nursing home, but she placed no value on them.[9] Her attorney later sought to introduce testimony of the accountant hired by the nursing home to prepare its 1974–75 Rule 49 cost report. Counsel for Norma Ruud and the nursing

8. The exclusion of an accountant's testimony relative to expenses claimed on the 1974–75 Rule 49 cost report and not on the 1973–74 indictment year cost report will be discussed below in the context of the trial court's refusal to instruct that no theft occurred if, because certain proper expenses were not claimed, no overpayment resulted despite the false claims made.

9. The donated items consisted of furniture and household appliances which had been used in her house before it was transferred to the nursing home. However, Norma Ruud purchased new replacements with nursing home checks for most of the transferred items, including a washer and dryer, a refrigerator, television sets, dressers, a coffee table and parsons tables.

home [10] asked the witness whether he had included in the 1974–75 report property which had been purchased prior to August 1, 1974, but had not been included in the 1973–74 report. The court sustained the state's objection to that question. This evidence was properly excluded in so far as it was offered to show that defendants intended not to steal but only to come out even: They claimed some improper expenses and did not claim some proper ones. Defendants may and did testify to such a state of mind; the accountant, hired after the fact, may not. With respect to the no-overpayment-in-fact theory, whatever defendants' intent, the offer of proof does not indicate that the accountant would have estimated appropriate depreciation deductions.[11] The accountant was allowed to testify that the 1973–74 report did not include depreciation on the Ruuds' residence nor on a lake cabin owned by the nursing home. Again, no values were assigned. To have instructed the jury as requested would have invited the jury to speculate.[12]

Defendants also requested the following instruction:

"The Defendants have claimed that they relied on their accountants in preparing the cost report. This goes to the question of whether any expenses which might have been incorrectly reported were willfully or intentionally reported incorrectly.

"If you find that the Defendants in good faith relied upon their accountants to inform them which costs and expenses could not legitimately be reported, then the Defendants would not be intentionally or willfully doing wrong in submitting the cost report to the Department of Public Welfare. These questions of reliance are matters for you to determine."

They argue that by refusing to so instruct the jury, the trial court in effect directed a verdict against them on that defense. The trial court did not include such an instruction "because [he] assumed that it would be argued that they relied, and that because they relied there was no intent. [He] assumed that to be the argument, but [he] didn't think an instruction would be appropriate." Upon being asked by defense counsel whether they could then "freely argue it," the court stated: "No question about that."

■ It is beyond dispute that a party is entitled to an instruction on his theory of the case if there is evidence to support it. The court need not give the instruction as requested by the party if it determines that the substance of that request is contained in the court's charge. In this case, the court gave repeated instructions with respect to intent. It did not mention reliance on an accountant, however, although the bulk of the argument of one of the two defense counsel was devoted to the issue of intent and particularly to the issue of reliance.

■ No Minnesota case discusses this defense. Numerous Federal cases in the context of prosecutions for tax evasion discuss the defense of reliance on an accountant or on an attorney. At least one holds that a general instruction on intent is not sufficient where good faith reliance on tax counsel is an issue and an instruction thereon was requested. *Bursten v. United States,* 395 F.2d 976 (5 Cir. 1968). Another held that the substance of the request had been given in the court's repeated emphasis of the government's burden to prove willful intent to evade taxes. *United States v. Stone,* 431 F.2d 1286 (5 Cir. 1970) (reliance on accountant). Under all of the cases, however, the instruction as requested by defendants is not proper because the defense is not available unless one has fully

10. One attorney represented Norma Ruud and the nursing home. A second represented Royce Ruud and the nursing home.

11. Any attempt to ascribe value to the property would have presented foundation problems although the state did not object on those grounds.

12. Counsel for Royce Ruud and the nursing home, moreover, conceded in his opening remarks to the jury that defendants owed some money to the state.

and fairly disclosed to the professional relied upon all the relevant information, and that element must be included in the charge. *United States v. Cox*, 348 F.2d 294 (6 Cir. 1965); *United States v. Stone, supra.*

Defendants did not fully and fairly disclose to the accountants relied upon all the relevant information. Accountant Oiva Penttila testified that the Rule 49 cost report was prepared from the nursing home's books. The nursing home carried expenses on its books according to categories which corresponded to the Rule 49 expense categories, e. g., dietary, nursing, etc. The amounts recorded on the Rule 49 report derived from the nursing home's general ledgers on which the various expenses were listed. According to Penttila, preparation of a Rule 49 report normally does not involve systematic review of the underlying documentation for the amounts recorded on the general ledger. It is not directed at determining whether an expenditure reported in the general ledger of the nursing home as the purchase of food, for instance, in fact represented such a purchase.

There is no evidence that either Norma or Royce Ruud advised Penttila that personal expenses were intermingled with nursing home expenses and that they expected him to identify them and prevent their transfer from the ledger to the report. Norma testified that she never informed the accountant that $2,935 in nursing home checks paid to three of her children represented gifts to her children and should not be included in the Rule 49 report. One of Penttila's associates, concerned with potential adverse income tax consequences to the closely held corporation because of the many salaries paid to family members, asked Norma about the salaries paid to the children to insure that they had performed the services for which they were being paid. Norma answered that the children had worked the hours for which they were paid. Norma testified that when she authorized the salaries for her four children she took into account the years they had worked for the nursing home without compensation. Yet there is no evidence that she ever asked the accountants whether it was permissible for Rule 49 purposes for her to do so.

Norma's major theory of defense other than reliance on her accountant was that she charged some personal items to the nursing home because *in her own mind* she offset those against nursing home items which she purchased with her own funds. Again there is no evidence that she ever asked the accountants whether this practice was permissible for Rule 49 purposes.

Royce Ruud knew that his air fare to Rapid City to visit his son was paid through nursing home checks but he never told the accountant to adjust these expenses out of the Rule 49 cost report.

From these examples, it is apparent that an instruction on the defense of reliance would not have been proper. In any event, the instructions given did not foreclose defendants from arguing the issue and defendants took full advantage of the opportunity.

5. Defendants contend that they are entitled to a new trial because the jury was "systematically skewed." Of the 57 members of the jury panel who were supposed to be available for voir dire, 19 did not appear and their names were not put in the box by the clerk; 2 others were excused by the court. The parties did not learn of the small pool out of which they were drawing names until after they had seated 10 jurors. At this point, defendants had exercised few of their challenges. Nevertheless, they proposed, in effect, to begin the selection anew. The court rejected their proposal and apparently suggested instead that they choose the remaining jurors from the total panel then available. The court denied defendants' subsequent motion for mistrial. Defendants state that of the 21 who were supposed to be part of the pool but were not, 12 were businessmen or salespersons, 5 were farmers, and 4 were housewives or retired. Eighteen of them were men and 3 were women. Of the group from which the jury was chosen, there were few business or salespersons, an unusual preponderance of females, "and a less than what it should be preponderance of farmers who might be available to sit on the jury."

Defendants are not entitled to a jury of a particular composition, nor to one that represents accurately the composition of the community. *State v. Holty,* Minn., 238 N.W.2d 615 (1976). There was nothing systematic about this exclusion; the composition of the pool was fortuitous. Defendants have shown no prejudice.

6. Finally, defendant Royce Ruud argues that the evidence does not support his conviction. The evidence that he aided and abetted the filing of the false claim and the theft effected thereby was necessarily circumstantial. Royce knew the basic operation of the Rule 49 report. He knew that, generally, the higher the costs reported, the higher the reimbursement rate. He had signed the Rule 49 report of the previous year. He had signed some of the nursing home checks for the purchase of goods and services unrelated to patient care. He signed some of the Ruud children's payroll checks.

The evidence supports the conclusion that he knew that personal expenses paid with nursing home funds would be absorbed by the Rule 49 report unless they were detected and removed. When testifying about one personal purchase with nursing home funds, he remembered calling the accountant to tell him to adjust it out of the nursing home books. With regard to other personal items, he testified that he relied upon the accountant to find those, although he did not call them to the accountant's attention. With respect to others, he said he did not know they were included in the Rule 49 report.

The jury simply did not believe Royce Ruud's testimony that he paid no attention to the source of funds for new furniture in his home, new color television sets, new clothes, and a $275 accuquartz watch for himself. Viewed most favorably to the verdict, the evidence sustains Royce Ruud's conviction, as well as the conviction of the other defendants.

Affirmed.

WAHL, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.