STATE of Minnesota, Respondent,

v.

Bruce C. PETERSON, Appellant.

No. C9–87–36.

Court of Appeals of Minnesota.

Aug. 18, 1987.

Review Denied Oct. 21, 1987.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas L. Johnson, Co. Atty., Vernon E. Bergstrom, Chief, Appellate Section, Michael Richardson, Asst. Co. Atty., Minneapolis, for respondent.

C. Paul Jones, State Public Defender, Susan K. Maki, Asst. Public Defender, Minneapolis, for appellant.

Considered and decided by NIERENGARTEN, P.J., and FOLEY and RANDALL, JJ., with oral argument waived.

## OPINION

RANDALL, Judge.

Bruce Peterson appeals his conviction by a jury of second degree assault, Minn.Stat. §§ 609.222 and 609.11 (1984 & Supp.1985). We affirm.

## FACTS

This is an assault case. Appellant's father, Leroy Peterson, died of a stroke at the end of August 1985. Appellant's older sister, Valarie Montez, stayed at Leroy Peterson's home while she was in Minnesota for the funeral. During this time, appellant tried, unsuccessfully, to have police remove the Montez family from the Peterson home, which he considered his, because he felt the Montezes were intruding.

After the funeral, Valarie and her family returned to their Colorado home. Several weeks later, Valarie and her three children came to Minnesota to help settle Leroy Peterson's estate, and again stayed in Leroy Peterson's home. Appellant did not like the Montez family staying at the Peterson home.

Montez and appellant had not gotten along since childhood. In addition, Montez blamed appellant for their father's death. Leroy Peterson's fatal stroke occurred after he and appellant had a serious argument. Shortly before Leroy Peterson died, appellant confronted Leroy Peterson, and blamed his unhappiness as a child on the fact that his parents were divorced and that Leroy had sexually abused another sister, Karen.

Appellant disapproved of the way Montez was settling his father's estate. He assumed he would play an integral part in settling the estate, but Montez informed him that another brother, Dwight, would handle the matter. Appellant disliked the fact that Montez removed many items from Leroy Peterson's home to their brother Dwight's home, because she believed the items were not safe. In addition, appellant was angry with Valarie Montez because he

believed she belittled him in front of her children and did not trust him.

Montez borrowed Dwight's truck to move some items. On September 26, 1985, appellant asked Montez if he could use the truck. Montez insisted appellant get Dwight's permission first, and had her oldest son, John, remove the keys from the truck so appellant could not drive it. After appellant got Dwight's permission, John gave him the truck keys. As appellant loaded items into the truck, he dropped the keys and was unable to find them.

Angry, he returned to the house and told Montez he would not have dropped the keys if she had not told John to take them from the ignition. He called her "filthy names," and threatened to hire people to kill her, rape her, and give her AIDS. Montez blamed appellant for their father's death and threw a glass of water at him. She accused him of trying to kill her by repeatedly arguing with her, which caused her headaches. During this argument, appellant's sister, Karen, called from Colorado. Montez left the dining room and went into the kitchen to take the call. As she talked to Montez, Karen could hear appellant yelling in the background. Karen asked to speak to appellant.

Appellant told Karen he was going to kill Montez because she caused him to lose the truck keys. Karen tried to calm appellant down, and suggested appellant look again for the keys. After appellant gave Montez the phone, he continued to yell at her. Karen testified that Montez said to her, "Oh my God, Karen, Bruce has an axe. Please hang up."

Montez testified that, while talking to Karen, she looked up and saw appellant with the axe in his hands. She testified he threatened to kill her. He swung the axe at her head, and she testified it would have hit her, had she not moved. Montez testified appellant "looked crazy." She ordered appellant to put down the axe, and testified that, at that point, he appeared to become "sane again." She asked John, her son, to call the police, and told Karen to hang up because appellant had an axe. Montez' children, John and Alece, corroborated

Montez' testimony. While John was calling the police, appellant took the phone from him and told the police there was no problem. Montez got on an extension and asked the police to come right away.

Appellant testified that, earlier in the evening, he threatened Montez, telling her that if she and her children did not show him more respect, he would tell them about the "nasty things" their grandfather had done to Karen. During the evening, he believed Montez was ignoring him. After he spoke with Karen on the phone, he gathered the children around, preparing to tell them about their grandfather's acts. Appellant claimed that Montez walked in on this scene and threatened to kill him before taking the children into the kitchen.

Appellant testified he was very agitated and feared Montez was going to shoot him. Earlier in the day, Dwight told appellant Montez found a gun in the house. Appellant testified he picked up the axe for protection. He testified:

I didn't know what she was going to do. I didn't know if she was going to talk to them [the children] or what. I didn't know if she was just getting them out of the way in case she was going to try to use a gun against me. I didn't know what she was going to do. I wasn't in a very good state. I've had at least two or three nervous breakdowns. My judgment was not real good at the time, you know, where I'd say—I'd walk in there and just go—I just grabbed the axe. I walked in there and—I walked around the corner. She didn't have a gun. I go, "I could have killed you," like that.

She made a death threat to me. Then I took the axe and I set it down. When I walked in there, when I walked around the corner, I just went like that (indicating). She didn't have a gun in her hand.

Police officers Roy and Grand arrived, questioned appellant and Montez, and arrested appellant for felony assault. At the police station Officer Grand read appellant his *Miranda* rights. Appellant said he did not want to answer questions. At some point, according to Officer Grand's testimony, appellant volunteered the statement

that, although he physically threatened Montez, he did not verbally threaten her. Appellant denies having made any spontaneous statements. He claims Grand asked him whether he picked up the axe and threatened his sister with it.

During trial, over defense objection, the court admitted *Spreigl* testimony of an assault committed by appellant against Karen while Leroy Peterson was in the hospital following his stroke. Appellant began arguing with Leroy's ex-wife in the hospital, when Karen told him to stop. Karen testified appellant punched her, causing her to fall against a wall. He testified he merely pushed her because she was too close and was trying to physically restrain him. He claimed he was upset because he believed Leroy's ex-wife was trying to get part of Leroy's estate.

At the close of trial, the court instructed the jury on second degree assault, but refused defense counsel's request for a self defense instruction, telling counsel:

> [M]y reading of the self-defense cases tells me that I should not instruct on self-defense here. The testimony goes, rather, to whether an assault was committed.

During deliberations, the jury sent a note to the judge asking, "What is the law concerning self defense and does it play any part in this case?" The court refused to expand on the instructions, stating to counsel, out of the jury's hearing:

> My feeling * * * was that were I permitted to comment on the evidence, I feel that the appropriate comment here would be that if they believe the defendant's testimony, then they should find him not guilty because no assault was committed.

## ISSUES

1. Did the trial court err by refusing to instruct the jury on self defense?

2. Did introduction of *Spreigl* evidence deny appellant a fair trial?

3. Did the court err by refusing to allow testimony on Mr. Peterson's sexual abuse of Karen?

4. Was appellant denied his constitutional right to a fair trial?

5. Was the evidence sufficient to convict appellant of assault?

### I.

*Jury Instructions*

Appellant requested an instruction on self defense. 10 Minnesota Practice, CRIM. JIG, 7.06, 7.08 (1985). The trial court refused to give the instruction, finding the evidence went only to whether or not an assault was committed. The court reasoned that the only testimony supporting a self defense instruction was appellant's testimony he believed Montez might have a gun. However, when appellant picked up the axe and entered the kitchen, he saw Montez did not have a gun. According to his testimony, he then put the axe down. The court reasoned: "If that is true, then he would not have the intent to cause the fear, and no assault was committed."

 "It is beyond dispute that a party is entitled to an instruction on his theory of the case if there is evidence to support it." *State v. Ruud,* 259 N.W.2d 567, 578 (Minn. 1977), *cert. denied,* 435 U.S. 996, 98 S.Ct. 1648, 56 L.Ed.2d 85 (1978).

> While there is no burden on a defendant to prove self defense, the defendant [has] the "burden of going forward with evidence to support his claim of self defense."

*State v. Graham,* 371 N.W.2d 204, 209 (Minn.1985), (quoting *State v. Columbus,* 258 N.W.2d 122, 123 (Minn.1977)). The process of "going forward" is complete when the defendant submits

> reasonable evidence that the victim was committing an independent assault on defendant at the time defendant [committed the assault].

*Graham,* 371 N.W.2d at 209 (citation omitted). Appellant puts forth four facts to support his claim for a self defense instruction: Montez's verbal threats to kill him; the fact that the two were having a heated argument; his belief that Montez might have a gun; and the fact that many years

ago Montez allegedly attacked him with a knife.

The incident with the knife is too remote in time to justify the instruction. Appellant admitted that by the time he looked into the kitchen, he knew Montez did not have a gun. This is not, of itself, determinative, but is a factor supporting the trial court's decision not to give the requested self defense instructions. It is the province of a jury to determine whether a defendant reasonably feared for his own safety. The jury considering the question must take all evidence into account.

The state argues appellant has not met his burden of "going forward" with evidence sufficient to warrant a self defense instruction. The state erroneously relies on *Columbus*, 258 N.W.2d 122. *Columbus* does not, as the state suggests, hold that a self defense instruction may not be justified even though evidence showed hard feelings between victim and defendant. In *Columbus*, defense counsel did not request a self defense instruction.

The state also argues that a self defense instruction was not required because no witness contradicted Montez' version of the facts. This reasoning is constitutionally baseless. Appellant's testimony contradicted Montez' version of the facts, and the trial court would have been acting within its discretion, if it chose to give appellant his requested self defense instruction, even though all other witnesses testified differently.

It appears the trial court took the "all or nothing" viewpoint when it refused to give the self defense instruction. The court seemed to say that if the jury believed Montez, it would find appellant guilty of assault, and if it believed appellant, it would find appellant not guilty. We hold the trial court acted within its discretion in refusing to give the instruction. While it would not have been improper to submit a self defense instruction to the jury for whatever weight the jury might choose to give it, we cannot say that, on these facts, the trial court's ruling was erroneous.

■ Appellant also argues that the court breached its duty to instruct the jury on "all matters of law which are necessary for the jury's information in rendering a verdict * * *." Minn.R.Crim.P. 26.03, subd. 18(5). The state points to Minn.R.Crim.P. 26.03, subd. 18(1), which governs requests for jury instructions. That subdivision states, in part:

> The court shall inform counsel of its proposed action upon the requests [for specific instructions] prior to the arguments to the jury * * *.

Subd. 18 does not require courts to give every instruction asked for. The court need only inform counsel which instructions it will give, and need only give instructions supported by the evidence. *Ruud*, 259 N.W.2d at 578.

## II.

*Spreigl Evidence*

Prior to trial, the state gave notice of its intent to introduce *Spreigl* evidence to show intent. The *Spreigl* evidence was of an assault by appellant against Karen, committed when Leroy Peterson was in the hospital prior to his death. The court ruled the evidence admissible at the omnibus hearing. When the evidence was admitted at trial, appellant renewed his objection. The court gave the appropriate cautionary instructions when the evidence was presented and as part of its jury instruction.

■ Evidence of other crimes is generally not admissible unless it comes under one of the recognized exceptions of (1) motive, (2) intent, (3) absence of mistake or accident, (4) identity of the accused, (5) sex crimes, (6) a common scheme or plan. *State v. Saucedo*, 294 Minn. 289, 291–92, 200 N.W.2d 37, 39 (1972); Minn.R.Evid. 404(b). Certain procedural safeguards must be met. *State v. Billstrom*, 276 Minn. 174, 178–79, 149 N.W.2d 281, 284–85 (1967); *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965). The evidence must be relevant. Minn.R.Evid. 402; *State v. Matteson*, 287 N.W.2d 408, 411 (Minn. 1979).

■ Proof of a defendant's participation in the *Spreigl* act must be clear and convincing. *Id.* (citing *State v. Titworth*, 255 N.W.2d 241 (Minn.1977)). The evidence is admissible only if its relevance outweighs its potential for unfair prejudice. *Id.* at 411. The *Spreigl* act should have some relation to the charged crime in some way, such as time, location or *modus operandi. See State v. Filippi*, 335 N.W.2d 739, 743 (Minn.1983).

■ Appellant argues that, despite cautionary instructions, the evidence was erroneously admitted and was irrelevant to show of intent to commit the charged assault. Appellant argues there must be a "clear nexus" between the other crime and the instant offense such that proof of one tends to establish some element of the other. This test was used in *State v. Gulbrandsen*, 238 Minn. 508, 514, 57 N.W.2d 419, 423 (1953) (Crimes must be so related to one another that proof of one tends to establish some element of the other). We find that the trial court did not abuse its discretion in ruling that the offered *Spreigl* evidence had sufficient nexus with the charged crime to be admissible.

Appellant also argues the *Spreigl* evidence is prejudicial. He argues the evidence depicts him as having a "powderkeg temper" potentially dangerous to anyone who caused his temper to ignite. Evidence of appellant's commission of the attack on Karen was clear and convincing, and relevant to show events leading up to the explosive atmosphere of September 26, 1985. We affirm the trial court's ruling that the *Spreigl* evidence, coupled with the requisite cautionary instructions, was admissible.

### III.

*Dysfunctional Family Evidence*

■ Appellant's counsel moved, at trial, for permission to cross examine Karen on her sexual abuse by Leroy Peterson, in an attempt to show that the Peterson family was "dysfunctional," and unable to relate to one another. One of the precipitating causes of the dysfunction, appellant argues, is Leroy's sexual abuse of Karen. He claims the evidence is relevant under Minn.R.Evid. 401. He argues his revelation of this "secret" to Montez' children was sufficient to provoke Montez to threaten appellant's life. These events, appellant argues, are relevant to place the evening of September 26, 1985, in context.

The state opposed the motion and successfully moved to preclude the defense from introducing the evidence. We hold the trial court properly excluded the evidence. The claimed relevancy is not apparent from the record.

### IV.

*Fair trial*

Appellant personally raises the following issues, arguing he was deprived of his right to a fair trial.

### A. Unreasonable Seizure of Evidence

■ The trial court, at the omnibus hearing, denied appellant's motion to suppress admission of the axe. Appellant argues only he could authorize entry into the Peterson home and that his sister, a third party and "temporary guest," could not authorize entry. Appellant admits the officers did not search the home. He protests "unlawful seizure" of the axe. The court based its ruling on the fact that the officers conducted no search and were given the axe by Montez.

In general, "consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." *United States v. Matlock*, 415 U.S. 164, 170, 94 S.Ct. 988, 993, 39 L.Ed.2d 242 (1974). United States Supreme Court cases uphold the constitutional validity of third party consent to search. *Id.* at 171, 94 S.Ct. at 993. The third party must possess "common authority over or other sufficient relationship to the premises or effects to be inspected." *Id.*

We hold Montez had a sufficient relationship to the premises to authorize seizure of the axe. Legal ownership of Leroy Peterson's home is unclear. The home was,

presumably, part of his estate. Appellant introduced no evidence to show he had a greater claim to the home than Montez. The seizure of the axe was proper because Montez invited the officer into the Peterson home.

### B. Statements made prior to and after appellant's arrest

While the trial court suppressed statements appellant made while he was being transported to the police station, it admitted appellant's statements made at the Peterson home and during booking procedures.

■■■ While Officer Grand was booking appellant, after he read appellant his rights, appellant volunteered that he had physically threatened Montez with the axe, and that appellant was going to hire someone to rape Montez and infect her with venereal diseases. After appellant was read his rights, and indicated he did not wish to talk, he told Officer Hudson he was going to take his inheritance and move to California; that his family had thrown him in jail for the last time; and that appellant would "get them." He told Hudson, "I would get you too if you didn't have a guy standing alongside of you right now." We affirm the trial court's ruling that, because appellant elected not to remain silent, his right to remain silent was not violated.

### C. Speedy Trial

Appellant twice withdrew guilty pleas, the last time on July 18, 1986, when he was not represented by counsel. He demanded a speedy trial at that time. Minn.R.Crim.P. 11.10. Appellant moved for dismissal at the omnibus hearing September 25, 1986, based on the passage of more than 60 days. The court held because counsel was appointed less than 60 days before the hearing, appellant was not denied a speedy trial. At the omnibus hearing, appellant's counsel testified he requested an October trial date due to other trial commitments, and he made a speedy trial demand July 30. Trial was held September 19, 1986. Appellant's right to a speedy trial was vindicated.

### D. Effective Assistance of Counsel

Appellant argues his counsel was ineffective. His concerns involve counsel's alleged failure to introduce various pieces of evidence, failure of counsel to visit him in jail as often as defendant wanted, failure of counsel to tell him he would be testifying at trial, and failure to file a writ of habeas corpus. During trial, after appellant made his concerns known, the judge afforded appellant the opportunity to finish the trial pro se, and appellant declined.

The record reflects that appellant's attorney did visit him in jail, told appellant he would be testifying at trial, and explained why the evidence would not be introduced. The trial judge also advised appellant his counsel was doing a good job of protecting his rights.

We hold appellant was afforded reasonably effective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

## V.

### Sufficiency of the Evidence

■■■ Appellant argues the testimony of Montez and her children was not credible and was insufficient to convict him of assault. He argues the children's testimony is the same as Montez' in several details, indicating they were coached. The jury judged the witnesses' credibility, and believed Montez. Her testimony was supported by appellant's admissions to the police and the testimony of other witnesses. The difference between appellant's version of the facts and the various witnesses for the state was simply a credibility issue for the jury, and we will not set this jury verdict aside.

### DECISION

The trial court is affirmed on all issues.

Affirmed.